INHABITANTS OF SOMERVILLE

*vs.*

INHABITANTS OF SMITHFIELD

Lincoln.    Opinion January 23, 1928.

*A verdict based upon the facts and the law not so clearly wrong as to warrant it being set aside.*

On general motion for a new trial by defendant. An action to recover for pauper supplies furnished by the plaintiff town to one Harlow Bigelow. The settlement of the pauper was the sole issue.

A verdict of $1131.60 was rendered for plaintiff and defendant filed a general motion for a new trial.    Motion overruled.

The case fully appears in the opinion.

*George W. Heselton, Herbert E. Locke and Cyril Joly,* for plaintiffs.

*Gower & Shumway,* for defendants.

SITTING:   WILSON, C. J., PHILBROOK, DUNN, DEASY, STURGIS, PAT-
TANGALL  JJ.

PHILBROOK, J.   This is an action brought by the inhabitants of Somerville against the inhabitants of Smithfield to recover the expense of pauper supplies furnished by the plaintiffs to one Harlow Bigelow.   The plaintiffs recovered a verdict and the case is before us on motion for a new trial.   There being no exceptions presented we adopt the familiar rule that the jury was fully and correctly instructed regarding the law pertaining to the case.   We are to examine the facts with a view to ascertaining whether the jury correctly interpreted the facts in the light of the instructions given, or whether there was plain and manifest failure to so do, and that bias, prejudice or such misunderstanding of the law influenced their deliberations to such an extent that we should disregard the verdict and grant a new trial.

Harlow Bigelow is the legitimate son of Levi H. Bigelow, was born in Smithfield, April 6, 1869 and therefore became twenty-one years of age April 5, 1890.   He could not acquire a pauper settlement in Smithfield merely because he was born there, R. S. Chap. 29, Sec. 1 par. III.   When he was about two years old his father moved to Augusta taking Harlow and the other members of his family with him.   The father and his family must have lived in Augusta for a sufficient time and under such circumstances that he gained a pauper settlement for it is admitted that on July 12, 1888, Harlow Bigelow had a pauper settlement in Augusta.   This must have been a derivative settlement since legitimate children have the settlement of the father if he has any in the state, R. S. Chap. 29, Sec. 1, par. II.

By virtue of R. S. Chap. 29, Sec. 3, a pauper settlement acquired under existing laws remains until a new one is acquired.   A pauper settlement once acquired can be defeated only by one of three ways.

(1) A former settlement is defeated by the acquisition of a new one. (2) When a person having a pauper settlement in a town has lived or shall live for five years in any unincorporated place or places in the state, he and those who derive their settlement from him lose their settlement in such town.    (3) Whenever a person having a pauper settlement in any town in the state shall live for five consecutive years beyond the limits of the state without receiving pauper supplies from any source within the state, he and those who derive their settlement from him lose their settlement in such town.    We are not called upon to discuss the provisions of statute regarding pauper settlement of women which may be affected by marriage, since those provisions have nothing to do with the present case. Provisions (2) and (3) have no application here.    It is claimed by the plaintiff that Harlow Bigelow, in his own right, acquired a pauper settlement in Smithfield which he continued to enjoy until the date of the writ and thereby his original derivative settlement in Augusta had been lost.

In the year 1888 an arrangement was made between Harlow and . his father, and Harlow's great-uncle, John Harlow Bigelow, whereby Harlow was to go to a farm in Smithfield, known as the Marston farm.    It is not denied that the uncle told Harlow, "If you will go out on the farm and stay with your father and brother,—sick brother Frank—I will buy the farm."    Pursuant to this agreement Harlow and his father, and the brother Frank, moved to the Marston farm in Smithfield on July 12, 1888, Harlow then being a minor.    On being asked as to his intention in regard to living on that farm when he went there, he answered, "To live there right along, because I expected to have the place.    That was the agreement between my father and uncle."

Since Harlow had a derivative settlement in the city of Augusta at the time when he moved to Smithfield the plaintiff town must prove that for at least five successive years between his becoming of age, and the date of the writ, Harlow Bigelow had a home in the defendant town without receiving pauper supplies either directly or indirectly, and in the same manner had not since acquired a settlement in any other town.    *Ellsworth* vs. *Bar Harbor* 122 Me. 356.    In the case just cited the court reiterated the familiar doctrine that "To establish a home in the first instance in any town there must be per-

sonal presence with an intent to remain, or in other words, to reside there. If absence from such town is later shown before five successive years have elapsed, it must be made to appear that such absence was only temporary, that there was a fixed purpose to return. The home must be continuous. If within the five years the person is absent from the town without an intention of returning to it the continuity of his home is broken, and the settlement is not acquired. To continue a home while absent there must be at all times an intention to return to it. The intent need not at all times be active in the mind, but as often as it is the subject of thought at all, the animus revertendi must be found to exist or the home is lost."

On January 18, 1889, Harlow was married to Cora Bickford, daughter of Charles Bickford, and they lived on the Marston farm for a time. It should be noted that upon the date of that marriage he was still in his non-age. Soon after that marriage Harlow and his wife went to a farm known as the Stevens place, located in the same town of Smithfield, which farm he leased for a year and carried it on for halves. He took no household goods with him as the house was furnished. He planted and harvested a crop on the Stevens place and at the expiration of his year he went from the Stevens farm to the Charles Bickford place in Belgrade and in the spring of 1891 he moved back to the Marston farm. In a letter written by Harlow to the attorney for the defendant town on April 12, 1926, Harlow stated that he moved from the Marston farm to the Stevens farm in Smithfield in the year 1890, that he planted potatoes on the Stevens farm and that in the fall of 1890 he moved from the Stevens farm to the Charles Bickford place in Belgrade and in the spring of 1891 he moved back to the Marston farm in mud time. In his testimony at the trial it would appear that Harlow moved back to the Marston farm at the expiration of his lease of the Stevens place and that while he was on the Stevens place he visited back and forth at the home of Charles Bickford, exchanging work in haying, but he does not say that he moved to the Bickford farm from the Stevens place before returning to the Marston farm.

In argument the defendants emphasized the reasons which they allege controlled the action of Harlow in going to the Stevens place and thence, to the Bickford place, urging that the real reason which induced Harlow to go to the Stevens place was because he had not

received a deed of any portion of the Marston farm and was disappointed to such an extent that he left the Marston farm without any intention of returning there. In his testimony Harlow says that he went to the Stevens farm because the work was too hard for his wife on the Marston farm. Whatever influences caused him to leave the Marston farm at the time which he did yet the fact remains that in the spring of 1891 he did receive the promised deed and in mud time of that year he returned to the Marston farm. From that time onward his movements and intentions become important because he had then reached the age of maturity and could begin to acquire a pauper settlement in his own right. The defendants claim that there were several interruptions to his residence in Smithfield after 1891 to such an extent and of such nature as to preclude him from obtaining pauper settlement in his own right after he returned to the Marston farm in 1891. It is urged that Harlow drove a Star route in 1893 from Augusta by the way of Belgrade to New Sharon and that at another time he drove another Star route from North Belgrade to Smithfield but a careful examination of the facts shows that Harlow went to the Marston farm in Smithfield more or less and always returned there whenever opportunity or necessity permitted him to do so. It would exceed the limit of this opinion to recite in detail all of the movements of Harlow from the time when he went on to the Marston farm in 1891, as a man who had reached the age of maturity, and the date in 1901 when the foreclosure of a mortgage dispossessed him of his interests in that farm. This was a period of about ten years. And in his direct testimony on page 36 of the record he was asked "From the time that you went on to the Marston farm up to the time that you left the Marston farm in 1901, if that is the date, did you have any intention of changing your residence?" To which a negative answer was returned.

We feel justified in saying that so far as this element of the case is involved the jury properly found that Harlow, after receiving the deed in 1901, remained upon the Marston farm in Smithfield for more than five successive years without receiving pauper supplies and had thereby established a pauper residence in the defendant town, after he attained his majority.

A second issue presented by the defendants is this: if Harlow Bigelow did gain a pauper settlement in Smithfield, did he lose it by gain-

ing one elsewhere, and as there is no contention that he gained one elsewhere, except in Augusta, the question may be stated "Did Harlow Bigelow later gain a pauper settlement in Augusta?"

Under the contention thus raised on the second issue it becomes unnecessary to trace the wanderings of Harlow through various cities and towns in Somerset, Androscoggin and Kennebec counties. Briefly touching upon them it would appear that after leaving the Marston farm in Smithfield he went to the house of Elbridge Bickford in Belgrade, thence to Oakland, thence to the Steve Bickford house in Belgrade, thence to Waterville, thence to Madison, thence to Portland for a little while where he was working in a restaurant, thence back to Madison, thence back to Waterville, thence to Lewiston, thence to Auburn, thence to North Belgrade, thence to the Charles Bickford place again in Belgrade and thence to Augusta. In some of those cities and towns he declared his intention to remain and in some of them he voted and paid poll tax but in none of them did he remain long enough to gain a pauper settlement.

As having an important bearing upon his intention when he went to Augusta in 1913, i. e., as to whether he was only there for a temporary purpose or for the purpose of making that city his home it is claimed that Harlow registered as a voter in Augusta on March 6, 1914. In his application he declared his residence to be in ward four at 16 Water Street, saying that he had been a resident of Augusta since May, 1913, and giving his occupation as a clerk for G. W. Bigelow. This person is the brother of Harlow and was keeping a hotel known as the Cushnoc House where Harlow claimed to be acting as a clerk. His wife was not there with him nor his children. On the other hand his wife was at that time living at Belgrade with her daughter. After he got through working for his brother he worked for a short time for a Mrs. Marston in Monmouth and then went to work in Vassalboro at the Oak Grove School. Before going to Oak Grove he worked for a while as janitor in Waterville at the Maine Central Station, then worked in the railroad yard as a section man. It also appears that for a brief time before going to Oak Grove he worked for Henry Martin at East Vassalboro, although he is not quite certain whether his work for Henry Martin was before or after he went to Oak Grove. He only worked at Oak Grove three months and according to the certificate of the principal of Oak Grove Semin-

ary these three months were in the spring of 1919. While he was working in East Vassalboro his wife caused a libel for divorce to be served upon him which libel was served in Augusta.

"Q.　When the libel was served upon you where were you?
A.　Down to Augusta.
Q.　What were you doing there?
A.　I wasn't doing anything there.
Q.　Did you meet him (the sheriff) on the street?
A.　Yes, sir."

The libel was entered in court at the November term 1918 and the decree was granted November 23, 1918. After the divorce was granted Harlow went to Jefferson to work for Eben Trask where he worked "some over a year I guess." He then went to the Day place in Jefferson where he lived one winter and in the meantime had married one Abbie E. Hisler. It is admitted that the date of the marriage was November 26, 1919, the place of marriage was Jefferson and the residence of the groom was declared to be Augusta, Maine. From Jefferson Harlow went to Washington where he remained a few months and then to Somerville where he fell into distress as a pauper.

It should be observed that Harlow testified with reference to his residence at Augusta as follows:

"Q.　When you left Belgrade and went over to Augusta, clerking for your brother Gard, did you intend to settle there?
A.　No, sir.
Q.　Why not?
A.　I didn't have no place there.
Q.　You stopped with your brother Gard?
A.　Just temporarily; worked there a little while."

It should also be observed that when Harlow moved from Washington to Somerville, after his marriage on November 26, 1919, he had his wife with him and intended to settle in Somerville.

Gardner Bigelow, brother of Harlow, testifying with reference to Harlow's being in Augusta at the hotel was asked the following questions and gave the following answers, after testimony had been given with reference to Harlow's going to Belgrade.:

"Q.  Did he come back to your house—the city hotel?

A.  Yes, he was back and forth.

Q.  How long a time would he stay?

A.  Not but a short time.

Q.  By a short time how long would you say?

A.  Oh, he might be there a couple of months sometimes.

Q.  Did he leave any goods there when he went away?

A.  No, sir.

Q.  Did he bring any goods when he came back?

A.  No, sir.

Q.  Did he do any work such as clerking in the house when he came back those times?

A.  Well, as near as I remember it for about two years there—might be two years and a half—when he came back he would help some but after that he just came on a visit when he was going back and forth to his daughter's or son's that is all;  just a stopping place when he would be going back and forth."

\*   \*   \*   \*   \*   \*   \*

"Q.  Between the first time that he came to your house in 1912 and stayed there, as you say, off and on for a year or two, did he live at your house—make your house his house?

A.  No."

In cross examination the brother, Gardner, testified that he came back to Augusta to live in 1912 and engaged in the hotel business at the Cushnoc House.  He testified that in 1913 that Harlow was there some of the time at work in the hotel but not working steadily and that the same condition existed in 1914 and that Harlow's wife was never at work in the hotel but always lived at Belgrade;  also that Harlow was in Augusta in 1915 but not to stay there;  that in 1916 Harlow was in and out of Augusta but not there to stop any length of time;  that in 1917 he does not think Harlow was in Augusta "Not to work to my knowledge, but I may be wrong";  the witness could not tell whether Harlow was in Augusta in 1918 and does not think that Harlow was in Augusta at all, to stop, in 1919;  that in 1919 Harlow went to Jefferson.

Before closing the plaintiff's case and after conference with counsel for the defendant it was agreed that the tax record and the records of voting in the city of Augusta, so far as Harlow Bigelow was concerned, would show the following:

POLL TAXES PAID. Harlow Bigelow paid poll taxes in Augusta for the years 1914, 1915, 1916, 1917, 1918, 1919, 1920, 1921, 1922 and a poll tax assessed for the year 1923 was abated July 21, 1924;

VOTING. The check lists in Augusta, so far as produced, would show that Harlow Bigelow voted in Augusta in 1915, 1916 and 1922. The check lists for 1914, 1917, 1918, 1919 were not produced. The check lists for 1920 and 1921 and 1923 were produced but did not show that Bigelow voted.

In defense there was presented considerable evidence by way of oral testimony and depositions in the attempt to show that Harlow did not gain a pauper settlement in Smithfield between the years 1891 and 1901 but we have already passed upon that phase and decided adversely to the defendants' contention. In argument defendants' counsel rested heavily on the effect of the evidence produced from the tax records and voting lists just above referred to.

In *Monroe* vs. *Hampden*, 95 Me. 111, this court, speaking through Mr. Justice Powers, gives an illuminating discussion of the effect of taxation and voting as bearing upon the question of establishing a pauper residence. The court there says: "Taxation and voting, while important, are not conclusive. The assessment and payment of a poll tax is strong evidence that a person has his home in a town on the first day of April. It applies with much less force to the intervening periods and is not inconsistant with a person having changed and abandoned his home in such town during the time between April first of two successive years. The inference to be drawn from voting is much stronger as to the three months immediately preceding than as to the intervening time. It is simply a fact with the other facts in the case to be weighed by the jury. Voting and taxation acquiesced in and affirmed by the payment of the tax are acts of much stronger probative force when relied upon to prevent the gaining of a pauper settlement, than when offered to establish one. The former may be effected in a day if the requisite intention coincides with the absence from home. The latter must stretch through every day for five successive years. They tend much more strongly to establish the pres-

ence at the time when the tax is assessed and the intention at the time the vote is cast than they do at any subsequent time." It is true that the tax records show that the poll tax of Harlow Bigelow was paid in Augusta for nine successive years from 1914 to 1922 but it is quite plain that Harlow Bigelow did not understand his full obligation or duty with reference to the payment of poll tax because of the following questions and answers:

> "Q. Did you understand that you did not have to pay a poll tax if you didn't live in a place?
>
> A. I didn't understand it, I paid it because they sent it to me, that is all.
>
> Q. And you paid the poll tax to the city of Augusta after you had changed your residence?
>
> A. Well, they sent me the bill and so I sent it to them."

Thus it will be seen that although he paid a poll tax for nine consecutive years in Augusta, yet he voted in that city only three times, namely, in the years 1915, 1916 and 1922.

But the evidence is quite plenary that between the years 1914 and 1922 he had been wandering from town to town getting work where he could and expressing his intention in some instances to reside elsewhere than in Augusta. Not only does Harlow give testimony of his absence from Augusta during the years just referred to but his brother, Gardner, and Gardner's wife, substantiate Harlow's testimony and they are not contradicted by testimony of oral witnesses. Moreover he took no personal belongings to Augusta and left none when he went away. He was simply a laboring man going where he could obtain work and having no particular house or place in Augusta to which he might of right resort, having open to him only the home of an indulgent brother.

The questions involved are questions of fact and to borrow the closing words of the court in *Monroe* vs. *Hampden*, supra, "To grant the motion would be to substitute the judgment of the court for that of the jury, as to pure questions of fact about which intelligent and conscientious men might have different views. This the court will not do."

*Motion overruled.*